UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:20-CR-00066-HAB |
| | ) | |
| JAKWAN D. BRASTER | ) | |

**OPINION AND ORDER**

Defendant, Jakwan Braster ("Braster"), pleaded guilty to three counts of an eight-count Superseding Indictment charging him with drug and gun crimes. (ECF Nos. 51, 78, 79) In the presentence investigation report ("PSR"), the probation officer included an enhancement because she found that Defendant made a credible threat to use violence under USSG §2D1.1(b)(2). (ECF No. 82). Defendant objected to this enhancement. (ECF No. 83). The Court held an evidentiary hearing on Defendant's objection (ECF No. 91) and instructed the parties to file a notice informing the Court whether further briefing would be necessary by November 22, 2024. Defendant filed nothing, the Government did not request further briefing (ECF No. 96), and that deadline has passed. For these reasons, Defendant's objection will be SUSTAINED.

**I.     Factual Background**

In February and March 2020, the FBI successfully performed two controlled buys of cocaine from Defendant during an investigation into the "Mafia" street gang, or "M3". (ECF No. 83, ¶ 8). Because of the COVID-19 pandemic, the FBI had to pause their investigation because Defendant could not obtain cocaine from his supplier. Although the pandemic paused the cocaine supply, FBI agents were still able to conduct additional controlled buys for pounds of marijuana in July and August 2020. Agents obtained search warrants for Defendant's residence and another residence that he was linked to. At the residences, agents found guns and evidence of marijuana

distribution. Before trial, Defendant pleaded guilty to maintaining a drug involved premises in violation of 21 U.S.C. § 856(a)(1) (Count 5), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count 7), and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 8). (ECF Nos. 78, 79).

Ahead of Defendant's sentencing, the United States Probation Office prepared a PSR. (ECF No. 83). In this case, Count 5 and Count 8 were considered distinct Groups to determine Defendant's offense level, with Count 7 containing a statutory mandatory minimum term of imprisonment and having no effect on Defendant's offense level.[1] The probation officer determined that Count 5 carried an adjusted offense level of 22. (*Id.* ¶ 47). Pertinent here, the officer added two points because Defendant made a credible threat to use violence under USSG § 2D1.1(b)(2). The probation officer determined that Defendant's base offense level for Count 8 was 20 with four points added for specific offense characteristic not at issue, resulting in an adjusted offense level of 24. (*Id.* ¶¶ 53-59).

Defendant's combined offense level was determined by taking the offense level of the group with the highest offense level, Count 8, and increasing that offense level in accordance with USSG § 3D1.4. Under USSG §3D1.4, one unit is added to the combined offense level for the group with the highest offense level, taking Defendant's combined offense level to 25. An additional unit is assigned for each group that is one to four levels less serious that the highest offense level. Count 5 thus increased the combined offense level to 26. (ECF No. 83, ¶¶ 60-63). With adjustments for acceptance of responsibility, Defendant's Total Offense Level was 24. (*Id.* ¶ 66). An offense level of 24 and Defendant's criminal history category of II rendered a guideline

---

[1] Defendant does not challenge the probation officer's determination as to the grouping of counts.

2

range of 57 to 71 month's imprisonment to run consecutive to the five-year statutory mandatory minimum for Count 7. (*Id.* ¶).

Defendant objected to the credible threat enhancement relating to Count 5 and the paragraphs of the PSR that support it. (ECF No. 87). The threat enhancement was largely based on several messages and videos discovered from the search of Defendant's phone. (ECF No. 83, ¶¶ 29-30). The PSR explains that there were "a series of videos…made on March 30, 2020, which were apparent threats to a supplier for drug product not delivered." (*Id.* ¶ 29). Another video from Defendant's phone made on July 9, 2020, showed Defendant with a gun in his lap. (*Id.* ¶ 30). The PSR explains that Defendant, in the video, "bragged about how he was out in the streets…with a loaded pistol[,]" said "was 'never lacking,'" and yelled "out his window at 'B.G.'" (*Id.*). The Court held an evidentiary hearing to flesh out these underlying facts that the Government believes supports the enhancement's application. (ECF No. 91).

FBI Task Force Officer Adalberto Martinez testified for the Government. (Evidentiary Hearing Transcript, ECF No. 95, "Hearing T. at ___"). He discussed his involvement with the Mafia street gang investigation and how it led to Defendant's drug activity. (Hearing T. at 9). TFO Martinez was following Defendant's vehicle when he made the July 9, 2020, video, and could hear Defendant yelling from his vehicle. (*Id.* at 14). The Government then played the video. (ECF No. 92, Ex. 6).

The video depicts Defendant driving his vehicle with a firearm on his lap that was ultimately discovered at Defendant's residence. Consistent with the PSR, Defendant bragged about his possession of the firearm and how he keeps it on him, swearing on his mother's life that he was "never lackin'." After these general assertions, Defendant recognized somebody in a vehicle that pulled up next to his car. Defendant identified the person using their initials, a point of contention

3

among the parties. He then said, "what's up[,]" and to tell "them I ain't ever lackin'….and I keep this [gun] with me everywhere I go[.]"

TFO Martinez testified that he believed Defendant identified the person as "B.G.[,]" a rival gang member. (Hearing T. at 17). But it seems clear to the Court that Defendant said "V.G" and the man seemed to be Defendant's friend. (ECF No. 92, Ex. 6). On cross-examination, TFO Martinez explained that they had no evidence that the video was ever sent to another person or posted on social media. (Hearing T. at 33) And when Defendant took the stand, he identified the man as Vars Grandberry. (*Id.* at 66).

TFO Martinez then discussed a series of text messages between Defendant and others. (*Id.* at 18-27). On March 2, 2020, Defendant sent a text message to an unknown person asking, "where the fuck is my shit at quit playing games wit me" and saying, "u got me pissed…I'm not the fucking one[.]" (ECF No. 92, Ex. 1 at 43). After the person did not respond, he said, "on my brother head stone…u got me fucked up." (*Id.* at 44). TFO Martinez believed this to be a message between Defendant and his drug supplier based on the nature of the messages. (Hearing T. at 21).

TFO Martinez then discussed a series of text message between Defendant and his child's mother, "Niya," from March 11, 2020:

> **Defendant:** Send me yo grandad number or I'm pullin up in the morning my self[.]
>
> **Niya:** Don't do that[.]
>
> **Defendant:** Man, [N]iya, I really think u think I'm playin but I'm trying to be as nice as I can about my [money.] I'm not no mtf…I've been patient [enough] this 16 thousand not [16 dollars.]

4

(ECF No. 92, Ex. 1 at 61). TFO Martinez took these statements to mean that Defendant fronted somebody $16,000 for drugs that he never received. (Hearing T. at 22). The conversation continued with Defendant sending the following message:

> …[You] think this [is] a game[.] [I]f I didn't give him [that] money…them Mexicans was [going to] kill [your] grandpa. I saved his…life [and] Isaac [knows that.]…[M]tfs think I just [gave] him some money on some front shit[.] [That] was so they [wouldn't] kill [your] grandpa [and] his mom [and] Isaac [know] them Mexicans was [fixing to] kill [them] that night so somebody better [hear] me out or I'm [going to] do [what] I [got to] do…[and you] can think I'm just talkin[g] but I'm really [trying to] be nice[.] [M]tfs always [want to] think I'm just playin[g] [until] somebody['s] dead. [T]hen I'm the bad guy[.]

(ECF No. 92, Ex. 1 at 62). TFO Martinez believed that this statement related to Defendant fronting money and threatening to kill somebody if his debts were not paid. (Hearing T. at 23-24). A few minutes after that message, Defendant sent, "…I try time after time it's been 4 months." (ECF No. 92, Ex. 1 at 62). TFO Martinez believed this to indicate that Defendant's debt had been outstanding for four months. (Hearing T. at 24). The conversation between Defendant and Niya continued with Defendant saying, "[w]ell if you love your uncle [and] care about me…try [your] best to get in contact with him." (ECF No. 92, Ex. 1 at 63). Defendant also added, "just [know] I'm as serious as can be." (*Id.* at 64).

On March 18, 2020, Defendant texted Niya, "[a]sk him[.] Tell him [what] the truth is[,] not [what] Isaac [is] tellin[g] him[,] [because] if I catch his son, he['s] [going to] wish he gave me my money[.]" (*Id.* at 65). He followed that up with, "Cubby [is] the only one [being real] about [this.] [E]verybody else must not love [him.] [O]r care if he die." (*Id.* at 66). TFO Martinez opined that this was a death threat and that it was "all about drug trafficking." (Hearing T. at 25).

The Government also presented a series of videos from Defendant's phone. (ECF No. 92, Ex. 2-4). While the PSR says that these videos were created on March 30, 2020, they were created on December 20, 2019—about four months before the conversations above. (Hearing T. at 28). In

5

the first video, Defendant said, "I don't know what you and Isaac got going on with your [money.]…This [has got] nothing to do with Isaac…I need my [stuff]…You think you're [fixing to] take my twenty…I don't want [pounds of marijuana.]….I kill shit…on my mama." (ECF No. 92, Ex. 2). TFO Martinez thought that these statements suggested that Defendant fronted $20,000 for marijuana to a supplier. (Hearing T. at 29). In the second video, Defendant said, "…Why would you finesse me and tell me if I give you this money, you're going to bring me something? That's bad word…I am not the one…On my daughters…if I see you…bruh." (ECF No. 92, Ex. 3). And in the third video, Defendant said, "…[this] is going to spiral out of control and it's not supposed to go like that. You promised me we were supposed to be getting money[.]" (ECF No. 92, Ex. 3). TFO Martinez had no evidence that these videos were sent to another person or posted on social media. (Hearing T. at 33). And Defendant testified that he did not send or post the videos. (*Id.* at 42).

At the hearing, Defendant provided his own explanation for the messages and videos. He explained that Isaac was Niya's uncle with her grandpa being Isaac's father. (*Id.* at 39). And he testified that the videos from December 2019 were directed at Isaac. (*Id.* at 42). Defendant said that he loaned Isaac the money because Isaac owed "the Mexicans" some money. (*Id.* at 40). According to Defendant, Isaac showed him a video of "some Mexicans sitting outside of his father's house" and that Isaac could not pay them because of a recent robbery. (*Id.* at 40-41). Defendant's position is that the Mexicans were the ones threatening to harm Isaac or his father; not him. (*Id.* at 41-41). Rather, he was simply "concerned about getting [his] money back[.]" (*Id.* at 45).

On cross-examination, the Government addressed some specifics from Defendant's statements. As for the messages, any threatening comments were Defendant "just telling her what

6

Isaac was telling [him] that [the Mexicans were] going to do." (Hearing T. at 54). He nonetheless was hoping the messages would be relayed to Isaac. (*Id.* at 57). When he sent "somebody better [hear] me out or I'm [going to] do [what] I [got to] do[,]" Defendant claims he planned to tell Isaac's father what was going on. (*Id.* at 57-58). Regarding his statement "mfks always [want to] think I'm just playin[g] [until] somebody['s] dead[,]" Defendant explained that he was not "saying it like that" and meant it more in a general sense. (*Id.* at 58-59). As for statements that "Cubby [is] the only one [being real] about [this.] [E]verybody else must not love [him.] [O]r care if he die[,]" Defendant explained that he was not the person putting anybody in danger. (*Id.* at 62). The government pointed out that in one of the December 2019 videos, Defendant stated, "I don't know what you and Isaac got going on with your [money.]" (*Id.* at 50; ECF No. 92, Ex. 2). He could not remember who "you" was. (*Id.*). Defendant was never paid back for Isaac's debt. (*Id.* at 64).

**II.   Legal Discussion**

U.S.S.G § 2D1.1 provides for a two-level increase to a defendant's offense level if he "made a credible threat to use violence[.]" U.S.S.G § 2D1.1(b)(2). The Government bears the burden to show that the enhancement applies by a preponderance of the evidence. *United States v. England,* 555 F.3d 616, 622 (7th Cir. 2009). Defendant's objection to the enhancement appears to come in several forms. First, Defendant contends that any "apparent threats" made by him were made during a pause in the investigation and there is "no indication" that "the statements…had anything whatsoever…with the charges that are the basis of the [Superseding] [I]ndictment." (ECF No. 87). Second, based on the trial testimony, the Court can glean that Defendant argues that he made no threats at all.

As a preliminary matter, the Court notes that even if it sustained Defendant's objection, Defendant's guideline calculation would not change. The probation officer applied the credible

7

threat enhancement to Count 5—offense level 22—which carried a lower offense level than Count 8—offense level 24. Count 5 and Count 8 are two distinct groups. If the Court sustained Defendant's objection, his offense level for Count 5 would be 20, which is still one to four levels less serious than Count 8. *See* U.S.S.G. § 3D1.4 ("Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious."). Defendant's total offense level would thus remain the same. Taking offense level 24—the higher of the two offense levels—for Count 8, adding one point for that offense and another point for Count 5, still leaves Defendant with a total offense level of 24 with adjustments for acceptance of responsibility. The Court nonetheless has a duty to properly calculate the guidelines and Defendant's objection is relevant for sentencing.

Starting with Defendant's argument that any threats were unrelated to the charges in the Superseding Indictment, U.S.S.G. § 1B1.3 defines "relevant conduct" for the purposes of sentencing. Relevant conduct includes "[a]ll acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant…that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(A). U.S.S.G. § 1B1.3(a)(2)—commonly referred to as "expanded relevant conduct"—applies to "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." Where, as here, subsection (a)(2) applies, relevant conduct includes "all acts and omissions described in subdivisions (1)(A)…above that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

There is no timing issue here. The Superseding Indictment charges that Defendant maintained a drug-involved premises from "on or about February 25, 2020 to on or about August

8

27, 2020," (ECF No 51 at 5). All of the alleged threats occurred within that time frame except for the series of videos made in December 2019. But even the video series is sufficiently connected. In Defendant's messages to Niya in March 2020, he said, "I try time after time it's been 4 months[,]" while trying to collect his debt. It is thus clear that Defendant was still trying to obtain his money during the time frame charged in the Superseding Indictment. That leads the Court to Defendant's other arguments. He can only succeed if he proves that the texts were not related to his drug trafficking activities or were not threats at all; issues that boil down to the believability of Defendant's proffered story.

      To that end, the Court does not find Defendant wholly believable. While Defendant claims that he was trying to collect his money and some unidentified Mexicans would harm Isaac, some things just do not line up in the Court's eyes. Defendant stated that the Mexicans planned to harm Isaac because he had yet to pay the Mexicans whatever debt they were owed. (Hearing T. at 58-59). But why would the risk of the Mexicans harming Isaac be any greater if he failed to pay back Defendant? The Court sees no reason why and Defendant did not provide an explanation. With that in mind, the Court does not view Defendant's messages, such as people "always [want to] think I'm just playin[g] [until] somebody['s] dead" or "everybody else must not love [Isaac]… or care if he die[,]" as indicating that the Mexicans were going to harm Isaac. More likely, they were threats from him to Isaac regarding Defendant's debt.

      Moreover, a threat is a threat even if it is communicated to a third person. *See United States v. Parr,* 545 F.3d 491, 497 (7th Cir. 2008) (discussing threats under 18 U.S.C. § 2332a(a)(3) & (a)). The fact that some messages were communicated through Niya is of no consequence and, indeed, Defendant hoped his messages would reach Isaac. (Hearing T. at 57). Defendant made clear that if he was not paid back, "somebody" would end up dead and people

9

must not care if Issac died. Defendant's verbiage, as well as his demeanor in the videos, leaves no doubt that Defendant was serious and angry about the situation. And the threats on Isaac's life were credible. By Defendant's own admission, he possessed firearms and keeps them on him. *Id.* at 75-76). He bragged about that much in the July 2020 video and encouraged others to reiterate that message. (ECF No. 92, Ex. 6). Defendant was also arrested for an offense in which he drove a car involved in a shooting that left one person "grazed" by a bullet. (ECF No. 83, ¶ 76-78). That said, Defendant possessed firearms, was capable of using them, and wanted people to know that when the alleged threats were made.

Defendant's best argument is that these alleged threats were not related to his drug trafficking activity. It is a close call, but the Court believes the scales tip in Defendant's favor. In his original message to Niya about Isaac's debt, he stated:

> [I]f I didn't give him [that] money…them Mexicans was [going to] kill [your] grandpa. I saved his…life [and] Isaac [knows that.]…[M]fks think I just [gave] him some money on some front shit[.]

(ECF No. 92, Ex. 1 at 62). Although the Court believes that Defendant was credibly threatening violence upon Isaac, Defendant's message indicates that he did not provide the money as a drug "front." And in one video from the December 2019 series, Defendant explicitly stated he did not want any drugs; rather, he just wanted his money back. (ECF No. 92, Ex. 2). Make no mistake, messages between Defendant and others show that he had fronting relationships to conduct his drug trafficking. But none of those messages were between Defendant and Isaac. Without more, the Court cannot say that his payment to Isaac related to his drug trafficking operation. Why did the Mexicans want to harm Isaac or his father? The Court does not know and nobody explained why at the evidentiary hearing. But Defendant did explain why he would want to harm Isaac. He loaned Isaac money. What was that money for? It's a "he said she said" situation between

Defendant and the Government. The money could be, as the Government contends, for a drug front. Yet Defendant has objective evidence otherwise which seems to fly in the face of that explanation. The Court does not believe that Defendant told the full story at the evidentiary hearing, and it seems he lied on some topics. But backed with his prior statements, he was credible enough for the Court to believe that the debt was not a drug front. That said, the Government has not met its burden by a preponderance of the evidence to demonstrate that the credible threat enhancement applies.

**III.    Conclusion**

For these reasons, the Court SUSTAINS Defendant's objection to the PSR (ECF No. 87), and the Court DIRECTS the probation officer to revise the PSR to reflect that the credible threat enhancement, USSG §2D1.1(b)(2), does not apply to Defendant. A sentencing date shall be set by separate entry.

SO ORDERED on February 28, 2025.

 s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT